**SEARS, ROEBUCK & CO. v. SCROGGINS.**

No. 12701.

Circuit Court of Appeals, Eighth Circuit.

Feb. 18, 1944.

Rehearing Denied March 9, 1944.

Robert George Winter, of St. Louis, Mo. (Roscoe Anderson, William R. Gilbert, and Anderson, Gilbert, Wolfort, Allen & Bierman, all of St. Louis, Mo., on the brief), for appellant.

Douglas H. Jones, of St. Louis, Mo., for appellee.

Before SANBORN and WOODROUGH, Circuit Judges, and HULEN, District Judge.

WOODROUGH, Circuit Judge.

This is an appeal from a judgment awarding damages to William Scroggins for personal injuries suffered as a result of a fall over boxes which had been placed in the aisle of defendant's store by its employees.

On the morning of May 29, 1941, at a few minutes past 10 o'clock, plaintiff, William Scroggins, his two sons, Bill and Joe, and a friend, William Reiter, entered the Sears Roebuck store on Grand Avenue in St. Louis and descended the stairway leading to the basement so that one of the sons might purchase some paint and a gadget for putting pin stripes on an automobile. The paint counter extended along the south wall of the basement, and leading into and forming a "T" with an east and west aisle parallel and adjacent to the paint counter was a north and south aisle, its sides formed by a dishware counter on the east and a glassware counter to the west. Plaintiff and his party proceeded down the north and south aisle to the paint counter. While Bill Scroggins was buying the desired items, a sticker placed on the paint counter and bearing the legend "God Bless America" caught plaintiff's fancy, and he turned and walked back north three or four steps so as to get a "distance look" at the emblem. Then he turned again toward the paint counter and with his left hand resting on the dish counter requested that the son, Bill, purchase an emblem characterized by its "golden glow." After the son had complied with the request, Reiter and plaintiff's sons started along the north and south aisle toward plaintiff on their way out of the store. As one of the sons drew even with plaintiff, plaintiff began to turn to leave the store and tripped backwards, falling over three boxes of glassware which had been placed in the aisle, and severely injured his back.

Defendant, appellant here, assigns as error the overruling of its motions for directed verdict at the close of plaintiff-appellee's case and at the conclusion of the evidence, and of the denial by the trial court of motion for judgment notwith-

standing the verdict, so that this appeal questions the sufficiency of the evidence to support the judgment. Appellant's contentions are that plaintiff did not prove that the boxes in the aisle caused his fall; that the evidence justified two inferences—one that the fall was caused by the boxes, the other that the fall was caused by a diseased condition of the plaintiff, which would preclude defendant's liability, and that plaintiff was guilty of contributory negligence.

■ (1) Appellant argues that there was no definite proof that the boxes caused Scroggins to trip and fall, contending that the testimony did not clearly show exactly what Scroggins did with his feet before he fell, and that he nowhere testified that any part of his body touched the boxes before the fall. However, from an examination of the testimony we are persuaded there is substantial evidence of such causal connection, making the question one for the jury.

Plaintiff testified in part as follows:

"I was standing facing this paint counter, and as they come by me I aimed to turn to go north and something tripped me and I tripped backwards * * * I aimed to try to catch myself—I grabbed at this counter of dishes and it seemed to me like I knocked down a thousand of them * * * as I fell my Bill yelled * * * and he grabbed me by the right wrist, but he was so close to me he couldn't hold my weight off the floor, so consequently my hip—the lower part of my hips caught the whole brunt of the lick on the concrete floor * * * it knocked me out. When I come to, my feet was up on some boxes * * * little cardboard boxes * * * 8 inches wide * * * about 12 or 14 inches high * * * there were three * * * in an 'L' from the counter.

"I was facing south and the dish counter was on my left and I had my left hand just resting on the edge of the dish counter. [The boys] was in front of me * * * about 8 or ten feet * * * [as they came near] I started to turn * * *.

"Q. And then you went over this obstacle? A. I went backwards over it, yes.

* * * * *

"Well, boxes was in front of me, and I lay there with my feet up on those boxes. * * * Some man came around * * * and he asked me if I had fainted and I said 'No sir. I didn't faint' and Joe, my son, * * * said, 'No, he didn't faint. He fell over these boxes.' [And the man] said, 'Why did that boy leave those boxes there' ".

On cross examination by defendant's attorney, after stating that he had been standing in the aisle as the boys started toward him, plaintiff continued:

"I started to make the quarter back step, to turn with my right foot.

* * * * *

"Q. Then what happened? A. I was tripped from behind.

"Q. Tripped from behind? A. Yes, sir.

"Q. Just as you made this turn, then you were tripped from behind? A. As I started to make it, yes.

* * * * *

"Q. * * * you said a quarter step, didn't you? A. Yes, sir. A quarter step backwards to my right.

"Q. And you were tripped? A. Yes, sir.

"Q. Did you see those boxes afterwards? A. I seen them afterwards, yes, sir.

* * * * *

"Q. Were the boxes standing up against this counter when you looked at them? A. They was up against the counter after I had fell over them. I looked and I seen my feet was still up on the boxes.

* * * * *

"Q. When you started to turn, didn't you get dizzy or something, grab a hold of here (indicating), knock off some dishes, and kind of ease yourself down to the floor like that (indicating)? A. No, sir."

Defendant continued cross examination and introduced depositions and asked plaintiff if he had made the same answer to the same questions therein as follows:

"A. And as I started to turn, to make a step, whenever you start to turn you make a quarter step in that direction when you start to turn, and you don't turn on your heel. As I started to make my turn there, there was something tripped me from behind.

"Q. Do you remember giving that answer? A. That is right."

Further along the same colloquy is repeated, and plaintiff answered:

" * * * I aimed to turn to go with them, and it tripped me."

Joe Scroggins testified:

"There were counters on either side, and as we proceeded toward my father, my father started to turn and go with my brother who was a few steps in front of Bill Reiter and myself, and as he started to turn, he fell backwards, and my brother grabbed him by the right wrist and held his head and shoulders up off of the concrete floor * * *. His feet was on the boxes. * * * At that time, there was some gentleman walked up and * * * said: 'Did you faint? Did you faint?' The man seemed rather excited. He [plaintiff] said: 'No sir, I didn't faint.' I said, 'No, sir. He fell over these boxes here.' He turned his head and looked at the boxes and said, 'My God! Why did that boy leave those boxes there?'"

The deposition of Harry B. Schwartz, superintendent of the store at the time of the accident, was introduced in evidence. He testified as follows:

"Yes. I asked him if he were the man that fainted; he said no, that he had tripped over a box.

    \*      \*      \*      \*      \*      \*

"Q. Did he show you or did you see the box over which he had tripped? A. I saw it after he was taken upstairs.

"Q. Now, how close to the place where you found him was that box or boxes? Tell us just what you did see. A. Well, as I approached him on the chair and asked him if he were the man that fainted, he said, no, he stated that he had tripped over a box and hurt his back.

    \*      \*      \*      \*      \*

"Q. Were the glasses on display in these boxes on the floor? A. They were on the floor.

"Q. The boxes? A. In a box, yes.

"Q. And the glasses were in that— A. In a box.

"Q. Were the boxes open, was the glassware visible in the boxes? A. I don't remember whether they were or not.

"Q. Well, were the boxes just piled in the aisle? A. No, they were placed right by the counter, right flat against the counter.

"Q. And what was their purpose, was it for display or for sale or for packing or unpacking? A. For unpacking.

"Q. For unpacking? A. Yes.

"Q. They had been delivered to the counter for someone to unpack and placed on the counter? A. Either on the counter or under the counter.

"Q. And they had not yet been unpacked, is that the idea? A. Not at that time."

It would unduly and unnecessarily lengthen this opinion to further set out the large amount of testimony of similar nature and import given by a number of other witnesses called by the parties. It is our conclusion that the over-all and cumulative effect of such testimony warranted the submission of the question to the jury. Defendant's assertion that if plaintiff had actually fallen backwards over the boxes, he would have used some such phrase in testifying as, "As I stepped back, I felt something with my leg", overlooks individual differences in modes of expression and description. The phrases utilized by plaintiff adequately described ,the relationship between the boxes and his fall and effectively show that the boxes were responsible therefor. He testified that "something tripped me" and the position of his feet when he regained consciousness clearly suggests that the boxes were the "something" that tripped him. There is just as much merit in the phraseology employed by appellee with respect to establishing that the boxes caused his fall as there is in the form suggested by appellant, and it would be far from reasonable to require plaintiff to use any specific form of testimony to establish his cause of action.

■ (2) Appellant takes the position that the testimony for plaintiff presents equal support for an inference that plaintiff fell as a result of tabes dorsalis, or locomotor ataxia, a disease caused by syphilis, and preventing one so afflicted from controlling his balance and the placing of his feet in a normal manner. While it is settled that where the evidence shows that an injury could have happened as a result of either of two or more causes, for only one of which a defendant would be responsible, so that a jury could arrive at a verdict only by speculation and conjecture, the plaintiff must fail,[1] a study of the evidence failed to persuade that this

1 Luettecke v. City of St. Louis, 346 Mo. 168, 140 S.W.2d 45; Fryer v. St. Louis-San Francisco R. Co., 333 Mo. 740, 63 S.W.2d 47; State ex rel. v. Haid, 325 Mo. 107, 28 S.W.2d 97, 102.

court has before it a case in which the evidence gives equal support to two or more such inconsistent inferences. Although defendant calls attention to the fact that plaintiff testified to having contracted syphilis in 1934 or 1935, that physicians called by plaintiff admitted that he was suffering from tabes dorsalis, and that defendant's physician testified after an examination of appellant several months subsequent to the accident, that plaintiff walked with a so-called "tabetic gait" (characterized by a gait in which the feet are spread apart, there is difficulty in putting the feet down one in front of the other, and the feet are raised high before letting them come down), in the final analysis it must rest its contention solely upon the opinion of its physician that if a person suffering from tabes dorsalis made a sudden movement and turned without watching his feet, he would be more likely to fall or lose his balance than a person not suffering therefrom.

Scroggins testified that the condition of his health immediately before the accident was fine; that he had had no sickness or illness of any kind in the past five or six years, and had not laid off a day, or any time at all, from his work as a carpenter; that during the couple of months before the injury he had spent his time out of doors hiking and fishing by day and by night, and that on such trips he tramped through fields and woods and up and down muddy banks without being hindered. That the night before the accident Scroggins, his sons, and Reiter, had been fishing on the river and Scroggins had had no trouble, and he had taken part in setting out the fishing lines and taking them in. In describing how he fell over the boxes in making the turn in the aisle, he denied that he had felt dizzy at the time. With respect to his disease, he testified that it had been "cleared up" immediately by treatment and that he had taken many blood tests, all of which were negative.

Joseph F. Scroggins, his son, testified that immediately before the injury his father was in the very best of health and had no difficulty in walking whatsoever; that the father, in building a house, was "climbing scaffolds, laying rafters and joists; he cleared the brush off a place to put the house on;" that he did manual labor and never laid off on account of sickness; that shortly before the injury they walked and went fishing together, and that his father got along as well as the rest of the party.

William Reiter testified that he had known Scroggins about a year and a half or two years before the injury and had been with Scroggins on a fishing party the previous night. He stated:

"We went down to the river and through the weeds and everything else out there, and they picked up some lines and then came back. * * * We commented on the way he got around and walked around at his age. He just walked around, it didn't seem like there was anything wrong with him. * * * He was right along with us."

Benjamin Hegger testified that he had known Scroggins about a year and three-quarters; that Scroggins' health was all right; that he went up terrace steps faster than the witness who was 14 years younger; that he had sometimes gone fishing with Scroggins, and that he had never seen Scroggins ill or suffering in any manner, shape or form.

The physicians who treated Scroggins from the time of his injury until the date of the trial testified that tests of Scroggins' blood were negative, that many persons afflicted with tabes dorsalis were able to walk in the daytime without watching their feet and that the fall might have aggravated the plaintiff's old blood disease.

It is clear that any possible inference arising from the evidence in this case to the effect that plaintiff's fall was caused by his disease is far overbalanced by the substantial evidence adduced by plaintiff showing that the accident occurred as a result of his fall over the boxes in the aisle. In view of the abundant testimony relating to the healthy, vigorous nature of plaintiff's day to day existence, the testimony concerning the blood tests and the consideration that the fall may have aggravated the disease, defendant's theory, based as it is solely on answers to hypothetical questions, is merely guess and conjecture, unsupported by any realistic analysis of the facts here involved. There is nothing else in the testimony to indicate or raise any reasonable inference that the accident resulted from the cause premised by defendant. The rule as contended for by defendant does not apply where, as here, the plaintiff has established with reasonable certainty that the cause for which defendant was liable produced

the result, Luettecke v. St. Louis, 346 Mo. 168, 179, 140 S.W.2d 45; Cole v. Uhlmann Grain Co., 340 Mo. 277, 100 S.W.2d 311, 317; Doughton v. Marland Refining Co., 331 Mo. 280, 291, 53 S.W.2d 236, 241; Kelly v. Kansas City Bldg. & Loan Ass'n, 229 Mo.App. 686, 81 S.W.2d 440; Weisman v. Arrow Trucking Co., Mo.App., 176 S.W.2d 37, 39; Pietraschke v. Pollnow, Mo.App., 147 S.W.2d 167; or where the plaintiff introduces substantial evidence that the injury resulted from the cause for which defendant is liable. Cole v. Uhlmann Grain Co., supra; Reaves v. Kramer, 231 Mo.App. 368, 97 S.W.2d 136; Thompson v. City of Lamar, 322 Mo. 514, 17 S.W.2d 960; Mott v. Kansas City, Mo. App., 60 S.W.2d 736; Baker v. Chicago, B. & Q. R. Co., 327 Mo. 986, 1004, 39 S.W.2d 535, 542; State ex rel. City of St. Charles v. Haid, 325 Mo. 107, 28 S. W.2d 97, 102. It follows that it was not necessary that plaintiff prove his theory of negligence to the exclusion of every other possible theory. Mott v. Kansas City, supra; Reaves v. Kramer, supra; State ex rel. City of St. Charles v. Haid, supra. Since the jury could reasonably conclude from the evidence that the boxes were the proximate cause of plaintiff's fall, the trial court properly refused the defendant's requests to take the case from the jury and, subsequently, to set aside its verdict.

(3) Appellant further contends that if plaintiff's testimony to the effect that he stepped backwards is to be believed, plaintiff was guilty of negligence as a matter of law. The issue of plaintiff's contributory negligence was submitted to the jury under a charge in which the trial court required the jury to find that "At all of said times [previously described] plaintiff was in the exercise of ordinary care for his own safety."

▮▮▮ Plaintiff, it is conceded, entered the defendant's store as an invitee, and while defendant is not an insurer of its business invitee's safety,[2] the defendant owed him the duty of maintaining the premises in a reasonably safe condition for his use while transacting business therein. The asserted contributory negligence rests on the fact that plaintiff did not look in back of him before taking the step to the rear. The evidence shows that he took a quarter-step back incident to turning and leaving the store. He had a right to expect that the defendant would use reasonable care in making the premises safe for his use; hence, in turning to walk down an aisle prepared by defendant for his use, he had a right to expect an unobstructed aisle. Armstrong v. Kroger Grocery & Baking Co., Mo.App., 78 S.W. 2d 564, 571; Phillips v. Montgomery Ward & Co., 5 Cir., 125 F.2d 248, 249; Hecht v. Harrison, App.D.C., 137 F.2d 687; Phelps v. Montgomery Ward & Co., 231 Mo.App. 595, 107 S.W.2d 939; Achter v. Sears, Roebuck & Co., 232 Mo.App. 915, 105 S.W.2d 959; cf. Champlin Refining Co. v. Walker, 8 Cir., 113 F.2d 844. Plaintiff might have seen the boxes had he looked in back of him and to the floor, but it does not follow that in executing a movement that is a normal part of, and an incident to, turning, he failed to exercise the requisite care for his own safety by not doing so. One need not look for danger when there is no reason to apprehend any. Willig v. Chicago, B. & Q. R. Co., 345 Mo. 705, 137 S.W.2d 430; Long v. F. W. Woolworth Co., Mo.Sup., 159 S.W.2d 619; Essenpreis v. Elliott's Department Store Co., Mo.App., 37 S.W.2d 458, certiorari quashed State ex rel. Elliott's Department Store Co. v. Haid, 330 Mo. 959, 51 S.W.2d 1015; Phillips Pet. Co. v. Miller, 8 Cir., 84 F.2d 148; Standard Oil Co. v. Burleson, 5 Cir., 117 F.2d 412. In considering the question whether plaintiff is guilty of contributory negligence, all the facts that his evidence reasonably tends to prove must be assumed to be established and all the inferences fairly deducible from such facts must be drawn in his favor. Walkup v. Bardsley, 8 Cir., 111 F.2d 789, 791; Illinois Power & Light Corporation v. Hurley, 8 Cir., 49 F.2d 681, 686; Svenson v. Mutual Life Insurance Co., 8 Cir., 87 F.2d 441, 442; Elzig v. Gudwangen, 8 Cir., 91 F.2d 434, 439; Champlin Refining Co. v. Walker, supra, 113 F.2d at page 846; Noble v. United States, 8 Cir., 98 F.2d 441, 442; McGivern v. Northern Pac. R. Co., 8 Cir., 132 F.2d 213, 216; Rearden v. F. W. Woolworth Co., Mo.App., 154 S.W.2d 373, 376; Armstrong v. Mobile & Ohio R. Co., 331 Mo. 1224, 55 S.W.2d 460, 462. Consideration of the evidence and the inferences to be reasonably drawn therefrom makes it clear

---

[2] Sears, Roebuck & Co. v. Peterson, 8 Cir., 76 F.2d 243; Champlin Refining Co. v. Walker, 8 Cir., 113 F.2d 844.

724

that the question whether plaintiff exercised reasonable and ordinary care for his own safety was one upon which reasonable men might differ, and was therefore for the jury. It is only where the facts are such that all reasonable men draw the same conclusion that the question of negligence becomes one of law for the court. Sears, Roebuck & Co. v. Peterson, 8 Cir., 76 F.2d 243, 248, and cases cited; Walkup v. Bardsley, supra, 111 F.2d at page 791, and cases cited.

Keeter v. Devoe & Raynolds, 338 Mo. 978, 93 S.W.2d 677, cited by defendant as controlling in its favor, is not applicable to the facts in this case. There, the plaintiff, who was helping carry a locker weighing about 50 pounds, backed into an open elevator shaft, the danger of which he could have seen without stopping to look. Obviously the standard of care required under the circumstances there involved can not serve as a criterion of conduct here.

We conclude that the trial court did not err in denying defendant's motions for directed verdicts or in refusing to grant defendant's motion for judgment notwithstanding the verdict.

Affirmed.